IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

HOMECARE CRM, LLC )
)
    Plaintiff/Counter-Defendant, )
)   No. 1:12-cv-01958-TCB
)
v. )   JURY TRIAL IS DEMANDED
)
THE ADAM GROUP, INC. OF )
MIDDLE TENNESSEE, d/b/a )
PLAYMAKER CRM )
)
    Defendant/Counter-Plaintiff )
)
v. )
)
CONTACTIVATION, INC., )
DANIEL CHRISTOPHER TUNNELL )
KEAGAN BROWN and )
ANNIE TUNNELL MCDANIEL )
)
    Counter-Defendants. )
)

## THE ADAM GROUP, INC. D/B/A PLAYMAKER CRM'S AMENDED COUNTERCLAIM AGAINST HOMECARE CRM, CONTACTIVATION, INC., DANIEL CHRISTOPHER TUNNELL, KEAGAN BROWN AND ANNIE TUNNELL MCDANIEL

The Adam Group, Inc. of Middle Tennessee d/b/a PlayMaker CRM

("PlayMaker"), for its Amended Counterclaim, states as follows:

## SUMMARY OF THE CLAIMS

PlayMaker has built its company and its CRM software "from the ground up" over the last four years. After much hard work, investment, and risk, PlayMaker is experiencing growth and success in the home care CRM marketplace. PlayMaker employees began to hear that Daniel Christopher Tunnell ("Tunnell") and HomeCare CRM, LLC ("HCRM") were saying very negative things that were and are patently false about PlayMaker to its customers and potential customers. PlayMaker also learned that Tunnell and HCRM had written an email to one of PlayMaker's clients containing extremely damaging and untrue information about PlayMaker and its products. In addition to deriding PlayMaker and its products, Tunnell, HCRM, and Contactivation, Inc. have been making numerous false statements about the qualities of HCRM's own products— statements that are material to the consumer's decision to buy CRM software.

To make matters worse, HCRM unlawfully obtained access to PlayMaker's trade secrets by tricking a low-level subcontractor working for an unsuspecting PlayMaker customer, LivinRite Home Health Services ("LivinRite"), into disclosing the username and password of a LivinRite employee to access PlayMaker's CRM software. Although the subcontractor was told by Annie Tunnell McDaniel, HCRM's Vice President of Support Services, that HCRM only

2

would use the password to provide LivinRite with instructions on how to export LivinRite's data from PlayMaker's software, in fact HCRM used its access to PlayMaker's software to misappropriate PlayMaker's trade secrets and to unfairly compete against PlayMaker – and never even provided LivinRite with the export instructions that served as the pretext for obtaining access.

McDaniel then widely disseminated this confidential password and user name throughout HCRM. Over the course of several months, at least seven HCRM employees – including Joseph Caudill, HCRM's chief software architect – used the LivinRite employee's password to access and review every facet and aspect of PlayMaker's software. HCRM continued to improperly access PlayMaker's software even after filing this lawsuit for the purpose of examining PlayMaker's mobile application. In addition to its improper access through LivinRite's account, Keagan Brown, HCRM's Vice President of Product Development, obtained access to PlayMaker's software in October 2012 under false pretenses and in violation of Playmaker's terms of use.  Upon information and belief, HCRM used its improper access through Brown and the LivinRite account in the development of HCRM's own mobile application.

After gaining this improper access, which subjected PlayMaker's unsuspecting client to extensive liability from PlayMaker and others, at least seven

HCRM employees spent approximately *25 hours* unsupervised and unrestrained on PlayMaker's highly confidential system, looking extensively at the pages and features of it, running reports and creating a document (the "Matrix") that compared every aspect of PlayMaker's system with HCRM's system. HCRM misappropriated this highly confidential trade secret information in an effort to "sell against" PlayMaker and, upon information and belief, to improve its own systems so as to enable it to unfairly compete with PlayMaker.

When confronted with this information, HCRM denied that it had done anything improper and denied that it had created a document which described PlayMaker's system (the "Matrix") or used the information in any way. HCRM's denials are false.  PlayMaker has confirmed the existence of the Matrix. PlayMaker also has confirmed that an HCRM employee attempted to "wipe" the hard drive of a computer containing the Matrix long after HCRM filed this case – and long after all HCRM employees had an obligation to preserve documents containing evidence relevant to this case.

In this lawsuit, PlayMaker asserts that these actions amount to defamation and unfair competition, false advertising, misappropriation of trade secrets and breach of various fair trade statutes under Georgia law and otherwise. PlayMaker believes that these Defendants are trying to destroy its business and free-ride on

4

PlayMaker's software development efforts. PlayMaker brings these counterclaims to protect the company and products it has worked so hard to build.

## THE PARTIES

1.  Counter-Plaintiff PlayMaker is incorporated in Tennessee with its principal place of business in Tennessee. The servers for PlayMaker's software are located in the State of Delaware.

2.  Counter-Defendant HCRM, a Georgia limited liability company with its principal place of business located at 4555 Mansell Road, Suite 300, Alpharetta, GA 30022, is the original Plaintiff in this action and is a competitor of PlayMaker. Both parties sell customer relationship management ("CRM") software in the home care industry.

3.  Upon information and belief, Counter-Defendant Contactivation, Inc. ("Contactivation") is an affiliated corporation of HCRM and has its principal place of business at 4555 Mansell Road, Suite 300, Alpharetta, GA 30022. Upon information and belief, Contactivation developed, marketed and sold the HomecareCRM software exclusively until the creation of HCRM in approximately October 2009. As recently as February 2012, HCRM's website indicated that the HomecareCRM software was "powered by Contactivation." As recently as July 2012, Contactivation's website indicated that its employees participate in the

5

development, marketing and sale of the HomecareCRM software. Upon information and belief, Contactivation and HCRM share the same principal place of business and the same facsimile number, share certain owners, officers, employees and/or contractors, and share the same attorneys.

4.     Counter-Defendant Daniel Christopher Tunnell is the Senior Vice President of Sales of HCRM and, upon information and belief, directs its actions and the activities of the Contactivation employees as described herein.

5.     Counter-Defendant Annie Tunnell McDaniel is the Vice President of Support Services of HCRM and the sister of Daniel Christopher Tunnell. Upon information and belief, McDaniel resides in or around Birmingham, Alabama.

6.     Counter-Defendant Keagan Brown is the Vice President of Product Development of HCRM and, upon information and belief, resides at 12620 Dawn Circle, Bishopville, Maryland 21813.

7.     Tunnell, McDaniel, Brown and Contactivation may be properly joined with HCRM in this action because certain of PlayMaker's claims are asserted against the five of them jointly, severally, or in the alternative, and arise out of the same series of transactions and occurrences. In addition, common questions of fact and law will arise as to all of them in this action. Tunnell, McDaniel, Brown,

HCRM, and Contactivation are collectively referred to herein as the "HCRM Defendants."

## JURISDICTION AND VENUE

8. By filing its Complaint, HCRM has consented to the personal jurisdiction of this Court.

9. Upon information and belief, Counter-Defendant Contactivation is located in and does business in this district such that it is proper for this Court to exercise personal jurisdiction over it.

10. Upon information and belief, Counter-Defendant Daniel Christopher Tunnell regularly does business in this District and plans and directs the actions of the employees of Contactivation, who are located in this district, in the unlawful and unfair practices described in this Counterclaim. Further, upon information and belief, Tunnell has made defamatory statements about PlayMaker to potential customers located in this District, causing damage to PlayMaker in this District, such that it is appropriate for this Court to exercise personal jurisdiction over him. Further, upon information and belief, Tunnell plans and directs the instant litigation that was filed in this District, further establishing that it is proper for this Court to exercise personal jurisdiction over him.

11.    Upon information and belief, Counter-Defendant Annie Tunnell McDaniel regularly does business in this District and, together with her brother Daniel Christopher Tunnell and Keagan Brown, plans and directs the actions of certain employees of HCRM, who are located in this district, in the unlawful and unfair practices described in this Counterclaim.

12.    Upon information and belief, Counter-Defendant Keagan Brown regularly does business in this District and, together with Daniel Christopher Tunnell and Annie Tunnell McDaniel, plans and directs the actions of certain employees of HCRM, who are located in this district, in the unlawful and unfair practices described in this Counterclaim.

13.    Subject matter jurisdiction is proper under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1331 and 1338. This Court has supplemental jurisdiction over the state and common law claims under 28 U.S.C. § 1338(b) and § 1367(a). Venue is proper in this Court under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

14.    PlayMaker has enjoyed substantial growth and success in selling customer relationship management ("CRM") software to the home care industry. PlayMaker's founders, Judy Bishop and her son, Adam Bishop, have many years

of experience in the home care industry and have enjoyed an excellent reputation for honesty and forthright business ethics. PlayMaker has been extremely successful in translating the Bishops' industry experience into software that does what it is supposed to do and does it well, with excellent customer service.

15.   The home care industry has responded well to PlayMaker and, now that customers have a choice in CRM providers, customers are beginning to choose PlayMaker over HCRM.

16.   Upon information and belief, the HCRM Defendants have become alarmed about the increasing success of PlayMaker.

17.   First, Tunnell tried to broker an unsolicited deal for Contactivation and/or HCRM to purchase PlayMaker. In the process, Tunnell made demonstrably false statements to PlayMaker's management in an effort to intimidate PlayMaker into accepting their offer. PlayMaker rebuffed these overtures.

18.   When the attempted purchase was not successful, the HCRM Defendants tried other tactics to eliminate PlayMaker from the marketplace.

19.   PlayMaker and HCRM were recently competing for the largest client in the home health industry. This client chose PlayMaker.

## *PLAYMAKER'S PROPRIETARY SOFTWARE*

20.    With a large investment of time and money, PlayMaker and its development team developed its PlayMaker CRM software from the ground up and it is proprietary to PlayMaker alone.

21.    PlayMaker considers and has designated as highly-confidential trade secrets the design, features and content of the PlayMaker CRM software, the "look and feel" of the PlayMaker CRM software, the terms and conditions of its user and service agreements, its pricing and other business terms, the services PlayMaker offers via the PlayMaker CRM software, business and marketing plans, technology and technical information, product designs, and business processes (collectively, "the PlayMaker CRM Software Trade Secrets").

22.    The PlayMaker CRM Software Trade Secrets are not generally known, are not readily ascertainable by legitimate means and are subject to policies and procedures to keep them secret. PlayMaker has an advantage over its competitors by virtue of the fact that they do not know this information.

23.    The PlayMaker Software Trade Secrets are only disclosed pursuant to a non-disclosure agreement (an "NDA") that requires the receiving party to agree that the information is confidential and that the receiving party will not share this information with others. PlayMaker's customers, employees, contractors, and

vendors are required to sign NDAs and only given access to the PlayMaker Software and Trade Secrets on a need-to-know basis.

24.    For example, in 2009, Tunnell, while employed for an entity other that HCRM, applied on-line for a job at PlayMaker. During the interview process, Tunnell was given access to a "Lite" version of the then-existing PlayMaker Software. Tunnell was only given this access pursuant to an NDA.

25.    Similarly, when PlayMaker demonstrates the Playmaker CRM software to potential customers, PlayMaker does not grant the potential customer unfettered access to the software, but instead shows the customer a "demo" version, usually over a WebEx, that is controlled at all times by an employee or agent of PlayMaker. (See id. at ¶ 9.) Further, the potential customer is not shown the demo until it has been qualified by PlayMaker as a legitimate prospect after a "discovery call." (See id.) In this manner, Playmaker controls what portions of the Playmaker CRM software the potential customer is allowed to view and prevents the customer from making copies of the software. (See id.)

26.    After the customer has purchased the PlayMaker CRM software, each authorized user of the customer must "click through" an end user license agreement or "EULA" and agree to its terms before it can use the PlayMaker CRM software.

27.     The EULA sets forth the confidential nature of the PlayMaker CRM Software Trade Secrets and requires that this information remain confidential. The EULA requires that the user either agree to all of its terms and select the "I ACCEPT" button or, if the user is not able to accept and be bound by the terms, it must select the "I DECLINE" button and may not use the PlayMaker CRM software:

> IMPORTANT-READ THIS PLAYMAKERCRM SOFTWARE AS A SERVICE AGREEMENT (THIS "AGREEMENT") CAREFULLY BEFORE CONTINUING REGISTRATION. BY CLICKING THE "I ACCEPT" BUTTON OR OTHERWISE ACCEPTING THIS AGREEMENT THROUGH AN ORDERING DOCUMENT THAT INCORPORATES THIS AGREEMENT (THE "ORDERING DOCUMENT"), YOU AGREE TO FOLLOW AND BE BOUND BY THE TERMS AND CONDITIONS OF THIS AGREEMENT. IF YOU ARE ENTERING INTO THIS AGREEMENT ON BEHALF OF A COMPANY OR OTHER LEGAL ENTITY, YOU REPRESENT THAT YOU HAVE THE AUTHORITY TO BIND SUCH ENTITY TO THE TERMS AND CONDITIONS OF THIS AGREEMENT AND, IN SUCH EVENT, "YOU" AND "YOUR" AS USED IN THIS AGREEMENT SHALL REFER TO SUCH ENTITY, IF YOU DO NOT HAVE SUCH AUTHORITY, OR ***IF YOU DO NOT AGREE TO ALL THE TERMS AND CONDITIONS IN THIS AGREEMENT, YOU MUST SELECT THE "I DECLINE" BUTTON AND MAY NOT USE THE SERVICES.***

28.     In addition, the EULA provides as follows with respect to the confidentiality of the PlayMaker CRM Software Trade Secrets:

> 6.1   Definition of Confidential Information. As used herein, "Confidential Information" means all confidential and proprietary information of a Party ("Disclosing Party") disclosed to the other

Party ("Receiving Party"), whether orally or in writing, that is designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances of disclosure, including the terms and conditions of this Agreement (including pricing and other terms reflected in all Order Forms hereunder), the Customer Data, the Service, business and marketing plans, technology and technical information, product designs, and business processes.

29.     The Receiving Party under the EULA is not permitted to use or disclose the Confidential Information for any purpose outside the scope of the agreement:

> 6.2 Confidentiality; Protection. The Receiving Party shall not disclose or use any Confidential Information of the Disclosing Party for any purpose outside the scope of this Agreement, except with the Disclosing Party's prior written permission.

30.     The EULA also specifically forbids the customer or receiving party from using the PlayMaker CRM Software Trade Secret information to reverse engineer the product or to otherwise compete with PlayMaker:

> 5.2 Restrictions. Customer shall not (i) modify, copy or create derivative works based on the Service; (ii) frame or mirror any content forming part of the Service, other than on Customer's own intranets or otherwise for its own internal business purposes; (iii) reverse engineer the Service; or (iv) access the Service in order to (A) build a competitive or functionally similar product or service, or (B) copy any ideas, features, functions or graphics of the Service.

31.     In addition to the NDA and the "click through" EULA, there is a service agreement ("Service Agreement") that further serves to control the user's

relationship with PlayMaker and protect the PlayMaker CRM Software Trade Secrets. The Service Agreement contains the terms of use of the PlayMaker CRM software and resides on the system at all times as a link. It contains identical terms to the EULA terms set out above, or substantially similar terms if based on an earlier version of the EULA.

32.    Under the terms of the Service Agreement, the PlayMaker CRM Software Trade Secrets are confidential (Service Agreement at 6.1); the information cannot be used outside of the Agreement (Service Agreement at 6.2); can only be used by the customer for a proper purpose (Service Agreement at 3.4) and the customer's access to the PlayMaker CRM Software Trade Secrets cannot be used to reverse engineer PlayMaker's products or to compete with PlayMaker in any way (Service Agreement at 3.2).

33.    A breach of the confidentiality provisions of the EULA and Service Agreement entitles PlayMaker to an injunction because money damages are inadequate (EULA at 6.5; Service Agreement at 6.5).

34.    Furthermore, PlayMaker receives an email notification when a new client purchases an on-line subscription to the "Lite," "Single-User" version of the PlayMaker CRM software. PlayMaker reviews the notification and would prevent the access if the purchaser did not appear to be a legitimate potential customer.

PlayMaker has in fact declined to sell its on-line "Lite" version to potential purchasers that did not meet its criteria.

35.    In addition to the measures discussed above, PlayMaker also has additional procedures in place to protect its trade secrets. For example, PlayMaker carefully controls access to its facility; carefully selects vendors and contractors and requires confidentiality agreements from them; requires nested passwords to protect its computers and systems; maintains employee policies and procedures that require the identification and protection of confidential information; and requires departing employees and customers to return any confidential information they may have received from PlayMaker.

36.    The PlayMaker CRM Software Trade Secrets are the heart of the PlayMaker company and its most important and valuable asset.

### HCRM MAKES FALSE AND MALICIOUS STATEMENTS ABOUT PLAYMAKER

37.    PlayMaker's management has heard that the HCRM Defendants are defaming it to PlayMaker's potential customers. By way of one example, a current PlayMaker customer, which at the time had already successfully integrated with AllScripts, forwarded the forwarded the email attached as **Exhibit A** to Judy Bishop, PlayMaker's CEO. The email contains the following false statements:

(1)   HCRM is Allscripts'[1] exclusive CRM partner and that, as a result, PlayMaker is "contractually forbidden" from integrating with AllScripts;

(2)   Allscripts is "contractually forbidden" to integrate with PlayMaker;

(3)   PlayMaker will only tell the client this information after the client signs a contract with PlayMaker;

(4)   PlayMaker is "barely able to stay in business and won't be for much longer;"

(5)   HCRM's product is used by "18 of the top 22 Hospice/Homecare providers in the US and 56 of the top 100" and PlayMaker has "only 1 and [has] not been able to get that live;"

(6)   The client's project with PlayMaker "will not be a bad project but a disastrous one;" and

(7)   PlayMaker is "willing to say anything right now as they need ANY money they can get in to function."

38.   Upon information and belief, some or all of the HCRM Defendants have been making these sorts of false and defamatory statements about PlayMaker to PlayMaker's clients and potential clients as a matter of course in an effort to stop PlayMaker's growth and success. Upon information and belief, PlayMaker

---

[1]   Allscripts is a third-party software company that provides the home care industry with practice management and electronic health record technology, including electronic prescribing, care management, and revenue cycle software. This software and the ability to use it with the customer's CRM software would be an important consideration for potential customers of both PlayMaker and HCRM.

asserts that these statements have been made to an appreciable number of consumers in the home care industry in an effort to influence the buying decisions of these customers.

39.   PlayMaker sent HCRM and Contactivation's CEO, Karl Dumas, a cease and desist letter seeking to stop the false and defamatory statements of Tunnell and HCRM, a copy of which is attached to this Amended Counterclaim as **Exhibit B**. Rather than apologize, investigate, or make any effort to curb such behavior on behalf of Tunnell and HCRM, Dumas ratified such conduct by refusing to perform any ameliorative measures, refusing to cease and desist from defaming PlayMaker, and instead instigating this lawsuit based on frivolous claims.

## *HCRM MAKES FALSE CLAIMS ABOUT ITS SOFTWARE*

40.   Further, upon information and belief, HCRM, Contactivation and Tunnell have made and continue to make promises about the HomecareCRM software to customers and potential customers that are not true — promises that would be material to the customer's decision to purchase.

41.   For example, upon information and belief, customers have been told, and the login screen of the software has reflected, that the HomecareCRM software is based on the latest version of SalesLogix (the software's platform), which has

been, in fact, not true. Upon information and belief, HCRM's software has been based on an old, out-of-date version of SalesLogix that does not have the functionality of the latest version of SalesLogix.

42.    In addition to this practice being illegal, unethical, and misleading to customers, it allows HCRM to offer its product below cost and unfairly undercut PlayMaker's prices.

43.    Further, upon information and belief, by way of an additional example, some or all of the HCRM Defendants have told customers and potential customers that the HomecareCRM software will work successfully with mobile devices, such as Blackberry phones, when in fact the software had not successfully worked with all Blackberry phones.

44.    In addition, HCRM has made false claims about their products in advertising and press releases. For example, HCRM issued the following statements in a press release, attached hereto as **Exhibit C**.

> HomecareCRM, the industry leader in customer relationship management solutions, is excited to announce today that they have launched a company-wide CRM effort with SunCrest. HomecareCRM is responsible for system integration with HomecareHomebase, giving SunCrest one of the most robust CRM solutions available today.

45.    Similarly, in another recent press release, attached as **Exhibit D**, HCRM stated as follows:

The technology solution HomecareCRM is providing will allow Kindred's agency marketers to better identify, prioritize, recruit, and grow their referral base in local markets. HomecareCRM is able to offer their services to Kindred Healthcare because of HomecareCRM's integration with HomecareHomebase.

46.    These two statements from two different HCRM press releases are false. Upon information and belief, HomeCareHomeBase does not allow HCRM to integrate with it, yet this statement would be a material consideration for consumers who use HomeCareHomeBase products and are considering what CRM system would be most compatible.

### *HCRM, THROUGH KEAGAN BROWN, DANIEL CHRISTOPHER TUNNELL, AND ANNIE TUNNELL MCDANIEL, MISAPPROPRIATE PROPRIETARY DATA FROM HMS AND THEN GIVES IT TO CUSTOMERS FOR FREE TO UNDERCUT PLAYMAKER*

47.    As a further example of and evidence of a pattern and practice of these unfair business practices, as mentioned in PlayMaker's Answer, upon information and belief, Keagan Brown, Daniel Christopher Tunnell, Annie Tunnell McDaniel and HCRM wrongfully obtained copyrighted and trade secret data belonging to HMS, a third party data supplier in the home care industry.

48.    Upon information and belief, this data was wrongfully obtained from Amedisys, an HMS client, by Brown. During a time when he had access to

Amedisys's systems, and without the knowledge or permission of Amedisys, Brown saved the HMS data onto a jump drive.

49.     Upon information and belief, Daniel Christopher Tunnell and Annie Tunnell McDaniel were also involved in the scheme to misappropriate the HMS data through Brown's access to Amedisys's systems.

50.     Upon information and belief, because HCRM was not paying for the HMS data, it was able to and was in fact giving it away to its customers in an effort to influence those customers' buying decisions. This conduct amounts to an unfair business practice as to PlayMaker because it has undercut PlayMaker on price because PlayMaker has obtained this same data lawfully and has had to charge its customers the market rate for the data.

51.     HMS was forced to instigate a lawsuit against HCRM for copyright infringement, misappropriation of trade secrets, unfair competition, and unjust enrichment. A copy of HMS's complaint is attached as **Exhibit E**. Upon information and belief, HCRM settled HMS's claims by entering into a confidential agreement and paying a substantial amount of money in settlement to HMS for the data.

### *HCRM, THROUGH DANIEL CHRISTOPHER TUNNELL, USES THIS LITIGATION IN AN ATTEMPT TO INTIMIDATE A PLAYMAKER CLIENT INTO NO LONGER PROVIDING POSITIVE REVIEWS OF PLAYMAKER'S SOFTWARE*

52.     As an additional example of an unfair trade practice, Tunnell, on behalf of himself and HCRM, sent threatening emails to Steven Krohn, the then Director of Sales and Marketing at Paloma Home Health Agency. The subject of Tunnell's ire was that Krohn had made positive comments about PlayMaker in a LinkedIn discussion regarding CRM software in the home care industry. *See* Declaration of Steve Krohn.

53.     Tunnell attempted to intimidate Krohn into ceasing his positive comments about PlayMaker by implying that they were the result of an improper "quid pro quo."

54.     Tunnell also used this litigation as a weapon, threatening that his and HCRM's attorneys would depose Krohn about the non-existent "quid pro quo" in this litigation if he did not immediately cease giving positive reviews of PlayMaker's CRM product.

55.     Specifically, on August 30, 2012, Tunnell emailed Krohn and implied that he had engaged in improper conduct by recommending PlayMaker's CRM software and threatening to have him deposed in this litigation if he did not cease doing so. Specifically, Tunnell stated,

21

I realize that you and Judy [Bishop, a PlayMaker executive] have worked out a deal, but plugging them at our expense to this degree is not genuine […]  We are in the middle of litigation with [PlayMaker] and our attorneys wish to have us depose you and your owners for questions on what if any quid pro quo was offered for these opinions. […] If you feel the above request is not reasonable, I would ask for your legal's contact so that we may put our company's attorneys together so that they may work out a time to meet and set depositions to ascertain all the facts of this situation for the record.

56.    On September 5, 2012, Tunnell again threatened Krohn, stating,

Unless you are willing to cease all posts concerning HomecareCRM and Playmaker as of today, then we cannot let this drop. Please let me know who Paloma's legal counsel representation is and our attorneys will send them a letter initiating the communication of our concerns on the matter. If you would prefer we deal directly with your ownership rather than legal, then that will suffice as well, just let me know your preference.

### HCRM, THROUGH ANNIE TUNNELL MCDANIEL, TRICKS A PLAYMAKER CLIENT INTO PROVIDING LOGIN CREDENTIALS TO PLAYMAKER'S SYSTEM, WIDELY DISSEMINATES THE INFORMATION, AND THEN MISAPPROPRIATES PLAYMAKER'S TRADE SECRETS

57.    HCRM, through Brown, McDaniel, and at least four additional HCRM employees, improperly accessed PlayMaker's software and systems beginning no later than March 2012 and periodically thereafter until at least October 2012 – months after HCRM filed this lawsuit.

58.    One way that HCRM gained access to PlayMaker's systems was by using false pretenses to obtain the PlayMaker login and password of an employee of LivinRite, a PlayMaker customer.

59.    In the spring of 2012, HCRM was engaged in discussions with LivinRite during which HCRM sought to convince LivinRite to switch from PlayMaker to HCRM for LivinRite's CRM needs.

60.    LivinRite was interested in whether HCRM would be able to export the data that LivinRite stored on PlayMaker's software, in the event LivinRite decided to switch from PlayMaker.

61.    On or about March 26, 2012, HCRM proposed to schedule a call between Brendan McCormick, the President of LivinRite, and McDaniel, during which HCRM would explain how to export the data that LivinRite had logged in its PlayMaker account.

62.    McCormick responded that he would let Kevin Smith handle the call with McDaniel. Kevin Smith was not a LivinRite employee, but rather was affiliated with EJO Solutions, LLC, a third party vendor.

63.    On March 26, 2012, Smith participated in a phone call with McDaniel. During the course of that call, McDaniel explained that she did not know how to export LivinRite's data from its PlayMaker account. McDaniel then stated she would need login credentials to determine how to export the data. Smith asked McDaniel to create an instructional how-to document so that Smith could perform the export in the future.

64.    Pursuant to McDaniel's request and without the authorization of PlayMaker, LivinRite, or McCormick, on March 27, 2012, Smith emailed McDaniel a username and password that had been issued by PlayMaker to LivinRite solely for LivinRite's use by Jill Turner, a LivinRite employee. As the Declaration of Brendan McCormick makes clear, LivinRite employees have been instructed to never share their password or to otherwise allow anyone who is not a LivinRite employee, other than authorized consultants, to access PlayMaker's systems or software.

65.    In the March 26, 2012 email transmitting Jill Turner's PlayMaker username and password, Smith stated that he understood HCRM would be giving a demonstration to LivinRite the next day at 2:00 p.m. and that McCormick expected to receive information at that time regarding how the data extraction would work and how the process of migrating LivinRite's data would unfold. McDaniel responded that she would get the requested information ready and give it to HCRM's Derrick Barker, who she asserted would be providing the demonstration to LivinRite the next day. *See* LivinRite Emails attached to the Declaration of Joshua R. Denton.

66.    Beginning on March 27, 2012, HCRM accessed PlayMaker software using the Jill Turner login credentials and began reviewing every aspect of the

software and system. One of the Birmingham, Alabama IP addresses used to access the account was the same as the IP address associated with an email sent by Chris Tunnell to PlayMaker's founder, Adam Bishop.

67.   Approximately three hours after receiving the login credentials to PlayMaker's system, McDaniel emailed Smith and stated, "I think I have the process for getting the accounts and contacts out of the system." McDaniel then suggested that she spend additional time on the system to determine how to get "activities" out of the system and then "to validate the process."

68.   Approximately six hours after receiving the login credentials, McDaniel emailed Smith and stated, "I've got directions on how to get the accounts, contacts, and activities out of the system."

69.   Despite McDaniel's claim to possess instructions on how to perform the data export, HCRM never provided LivinRite with any such instructions. In fact, on or about April 4, 2012, McCormick inquired to Smith about the status of the information regarding how to export the data from PlayMaker's system. Smith responded,

> Annie McDaniel from HomecareCRM told me that she would be getting you all the particulars via that phone meeting you were having with that company last week. I haven't moved on the project since then.

> I can contact Annie and ask for the How-To and grab the data.
>
> I can just grab the data without talking to Annie – I don't think it's actually too complicated.

70.     Smith emailed McDaniel on April 5, 2012 and asked her, "Were the directions you mentioned below delivered to Brendan? Could you send them my way?" McDaniel responded, "Let me get with my sales team and find out how they want me to get this information to you." Nevertheless, neither McDaniel nor anyone else at HCRM ever provided the alleged instructions to LivinRite.

71.     Despite Smith's understanding that HCRM needed the information from PlayMaker's system to prepare a "demo" for LivinRite, no such "demo" based on migrating LivinRite's data from the PlayMaker system was ever presented to LivinRite. And, despite the fact that HCRM has claimed that it had the "authority" of LivinRite for this access, these claims are false. As McCormick's affidavit makes clear, McCormick and LivinRite never authorized HCRM's illicit access and, in fact, would never have done so:

> LivinRite has never authorized HCRM, Contactivation, Inc. and/or Daniel Christopher Tunnell, or any of their employees, affiliates or agents, to access PlayMaker's system or software or LivinRite's data contained on Playmaker's servers.
>
> LivinRite takes the security of its data and its patient information extremely seriously and, therefore, has carefully guarded the security

26

of its system and the systems of its vendors that contain such information.

It is extremely concerning that a company attempting to obtain LivinRite's business may have breached the security of LivinRite's confidential data in an effort to take the confidential information of its competitor.

McCormick Decl. at ¶¶ 10-12.

## HCRM USES THE LIVINRITE LOGIN CREDENTIALS OVER A PERIOD OF EIGHT MONTHS TO ACCESS AND REVIEW EVERY ASPECT OF PLAYMAKER'S SYSTEM

72.   On March 27, 2012, HCRM, without permission, accessed PlayMaker's software and servers for approximately four hours and 28 minutes from Birmingham, Alabama using the LivinRite password for Jill Turner. One of the IP addresses from which this access originated was a Birmingham IP address identical to the IP address associated with an email from Tunnell to PlayMaker's founder, Adam Bishop on May 14, 2012.

73.   On March 28, 2012, HCRM, again without permission, accessed PlayMaker's software and servers for approximately seventeen hours from three locations - Birmingham, Alabama; Newark, Delaware, and Bear, Delaware – using the Jill Turner account. Upon information and belief, Keagan Brown was one of the HCRM employees accessing PlayMaker's software on that date.

74.    On May 1, 2012, HCRM, again without permission, accessed PlayMaker's software and servers from Birmingham, Alabama using the Jill Turner account.

75.    During March and May, HCRM spent a total of approximately 22 hours in the unauthorized access of PlayMaker's systems.

76.    On October 1 and 2, 2012 – long after HCRM brought this lawsuit – HCRM again accessed PlayMaker's software from Delaware using the Jill Turner account. During the October 1 and October 2 incidents, HCRM reviewed PlayMaker's mobile application using at least three different portable devices: an iPhone, an iPad, and a Samsung tablet.

77.    Using the Turner password, HCRM performed approximately 911 page loads, ran reports from PlayMaker's system, may have printed and copied screens, and explored every facet and aspect of PlayMaker's system. This included the access and interception of data, communications, and/or information contained in PlayMaker's system, which was meant to serve and did serve as communications between LivinRite employees and/or between PlayMaker and LivinRite employees.

78.    On October 19, 2012, HCRM attempted to log in to PlayMaker's CRM software using the Jill Turner account on four different occasions from an

iPhone. Fortuitously, HCRM was not able to access PlayMaker's software through the Jill Turner account at that time because Turner had left LivinRite and her PlayMaker login credentials had been deactivated by Brendan McCormick on October 5, 2012.

79.    In response to PlayMaker's interrogatory inquiring as to HCRM's access to PlayMaker's software, HCRM did not disclose the October 2, 2012, incident of access or the attempts to access PlayMaker's software on October 19, 2012.

### HCRM EXECUTIVE KEAGAN BROWN CREATES A SHAM CUSTOMER ACCOUNT TO ACCESS PLAYMAKER'S PROPRIETARY SYSTEM AND SOFTWARE

80.    In addition to serving as an executive of HCRM, Keagan Brown also is the Treasurer and a member of the Board of Directors of the Delaware End-of-Life Coalition ("DEOLC"), a Delaware nonprofit. On the websites for both HCRM and DELOC, Brown is identified as "Keagan Brown."

81.    DEOLC's website reflects that, in addition to his HCRM email address, Keagan Brown has an email address associated with the DEOLC at kbrown@deolc.org. *See http://deolc.org/board*

82.     On October 1, 2012 an individual identifying himself as "Mark Brown" purchased online access to PlayMaker's software and system using the email address of kbrown@deolc.org.

83.     Upon information and belief, the billing address associated with the credit card used by "Mark Brown" to pay for the access to PlayMaker's software and system is the home address of Keagan Brown.

84.     Upon information and belief, the use of the name "Mark Brown" and the DEOLC email address was intended to conceal the fact that "Mark Brown" was, in fact, HCRM's Keagan Brown.  Keagan Brown had been disclosed as an individual that HCRM intends to call as a witness in this lawsuit just months before this incident.

85.     If PlayMaker had known that "Mark Brown" of "DEOLC" was actually Keagan Brown from HCRM, PlayMaker would not have permitted him access to PlayMaker's software and system. PlayMaker has safeguards in place that would have prevented such access had Keagan Brown disclosed his affiliation with HCRM.

86.     Keagan Brown accessed Playmaker's software and system on October 1, 2012 from Delaware – at or about the same time that he also was accessing LivinRite's PlayMaker account through the Jill Turner password. During this

30

access, PlayMaker's detailed system logs reflect that the features of PlayMaker's software viewed on the "Mark Brown" account were features that were not available on LivinRite's account via the Turner password.

87.   Before viewing any other aspect of the software and system, Keagan Brown agreed to the terms of the end user license agreement for PlayMaker, which provided that:

> Customer shall not (i) modify, copy or create derivative works based on the Service; (ii) frame or mirror any content forming part of the Service, other than on Customer's own intranets or otherwise for its own internal business purposes; (iii) reverse engineer the Service; or (iv) access the Service in order to (A) build a competitive or functionally similar product or service, or (B) copy any ideas, features, functions or graphics of the Service.

88.   On October 9, 2012, Keagan Brown logged in again to PlayMaker's systems and then sent an email to PlayMaker cancelling his subscription to the PlayMaker software, stating:

> Hello,
>
> We created an account to review your software and we don't feel it is the right fit for our needs due to the additional cost for the ipad functionality. As such, please cancel our account. We are aware that we are not entitled to a refund of any previously paid funds.
>
> Thank you,
>
> Mark Brown

89.     This statement was false and intended to deceive PlayMaker and continue to conceal that "Mark Brown" was, in fact, HCRM's Keagan Brown.

90.     In response to PlayMaker's interrogatory inquiring as to any HCRM employee's access to PlayMaker's software and system, HCRM concealed Keagan Brown's creation of the sham account and access to PlayMaker's software via same.

## PLAYMAKER'S SOFTWARE WAS IMPROPERLY ACCESSED FOR THE PURPOSE OF STEALING PLAYMAKER'S TRADE SECRETS AND UNFAIRLY COMPETING AGAINST PLAYMAKER

91.     It is beyond dispute that HCRM used the extraction of LivinRite's data (which never happened) as a pretext for obtaining unfettered access to PlayMaker's CRM software and trade secrets.

92.     Through its unauthorized access in the Jill Turner account, multiple employees of HCRM accessed PlayMaker's highly confidential and proprietary system for approximately 24 hours. PlayMaker's computer system logs show that HCRM employees from Birmingham, Alabama, and Delaware engaged in 911 page loads and accessed every facet and aspect of PlayMaker's software.

93.     HCRM's activities while accessing PlayMaker's system via LivinRite went far beyond any limited attempt to determine whether LivinRite's data could

be migrated, and HCRM employees accessed functions completely unrelated to the exportation of data. By way of a few isolated examples only, on March 27th, 2012, an employee in Birmingham accessed PlayMaker's payment terms at 2:55 pm, its service agreement at 2:56 pm, and printed screens and/or reports at 1:13 pm, 1:17 pm and 2:45 pm. Employee(s) in Birmingham and Delaware performed these and numerous similar operations and functions all during their ongoing access to the system.

94.    HCRM admitted that on March 27 and 28, five different HCRM employees – including McDaniel, Brown and three business analysts – used the Jill Turner account credentials to log into PlayMaker's software, and that a sixth employee, Derrick Barker, also reviewed the software but did not log in himself. HCRM claims that the March 27, 2012 and March 28, 2012 unauthorized access was for the purpose of determining how to migrate LivinRite's data from PlayMaker's software to HCRM's software.

95.    This explanation is untenable on its face, given that McDaniel's represented to LivinRite that she had completed the tasks requested by LivinRite on March 27 – meaning there was no possible legitimate reason for anyone at HCRM to be reviewing PlayMaker's software for approximately 17 additional hours on March 28. Moreover, it is difficult to believe that it required six HCRM

employees, three of whom were business analysts, approximately 22 hours to perform a task that Smith described as "not too complicated." In reality, this process should take no more than an hour. Amazingly, when asked to explain this conduct, HCRM claimed the March 28 access was due to "intellectual curiosity."

96.    Moreover, HCRM went back into PlayMaker's system in May and October 2012, long after any pretense of assisting LivinRite could be claimed.

97.    In fact, HCRM has admitted that McDaniel accessed PlayMaker's software on May 1, 2012, for reasons completely unrelated to LivinRite or any pretense of exporting its data from PlayMaker's software. HCRM admits that McDaniel actually used her unauthorized access to PlayMaker's CRM software on this date to help HCRM sell against PlayMaker.

**HCRM USED ITS ACCESS TO PLAYMAKER'S SOFTWARE TO CREATE A DETAILED MATRIX OF ITS FUNCTIONS AND CAPABILITIES TO UNFAIRLY COMPETE AGAINST PLAYMAKER**

98.    With the highly confidential information improperly obtained from HCRM's improper access to PlayMaker's software and servers on March 27 and 28, 2012, HCRM secretly created the Matrix, a Word document entitled "HCRM vs Playmaker Comparison 3.28.12.docx" at the following path: C:\Users\Grace\Documents\HCRM vs Playmaker Comparison 3.28.12.docx. The

title of the document demonstrates that it was created on March 28, 2012—the second of two days that HCRM spent approximately 22 hours accessing Playmaker's software through the Jill Turner password.

99.   This document was typed up in great haste by an HCRM employee, Traci Frazer, on her personal laptop at the direction of Derrick Barker for the purpose of selling against PlayMaker. *See* Affidavit of Traci Frazer.

100.   The Matrix contained a comparison of the features and capabilities of HCRM and PlayMaker's products and was created using knowledge derived from HCRM's improper access to PlayMaker's highly confidential and proprietary systems. This document was prepared for the purpose of competing against PlayMaker and was widely disseminated throughout the company.

101.   In addition, PlayMaker has recently discovered that on or about September 26, 2012, a current HCRM employee "wiped" Ms. Frazer's computer hard drive at HCRM's offices. This computer contained documents relevant to this case, including the Matrix (which HCRM has claimed was not created).

102.   The attempted destruction of this evidence occurred long after the commencement of this litigation and long after HCRM employees had an obligation to preserve documents that are relevant to this case. PlayMaker obtained a forensic copy of the "wiped" hard drive via subpoena and had its contents

reconstructed by a forensic computer analyst. The forensic analysis of the hard drive confirms that the Matrix did, in fact, exist; that it was created during HCRM's unauthorized access to PlayMaker's systems on March 28, 2012; and that it was created and used for the purpose of unfairly competing with PlayMaker.

103.   HCRM has, upon information and belief, used PlayMaker's highly confidential trade secret information to unfairly compete with PlayMaker. In fact, there is no other plausible explanation as to why seven HCRM officers and employees would spend approximately 25 hours of unauthorized and unrestrained access over many months, with nearly 950 page loads, if there was no commercial purpose in doing so. In fact, HCRM has admitted in its discovery responses that this information was used to compete with PlayMaker – in an attempt to take LivinRite away from PlayMaker as a client; to respond to a client's inquiry about whether PlayMaker had a particular feature; and to evaluate HCRM's own mobile phone application that was under development, as compared to the mobile phone application available on PlayMaker's system.

104.   By way of one additional example only, HCRM's use of PlayMaker's highly confidential and proprietary information to unfairly compete against PlayMaker is reflected in a November 9, 2012, e-mail from Tim Allard of HCRM to Richard Caldwell of Christus Health, a copy of which is attached at **Exhibit F.**

105.   Allard's email purports to contain an item by item comparison of HCRM's features and capabilities, as compared to PlayMaker's features and capabilities.

106.   HCRM could not have created such a comparison without the information acquired through HCRM's improper access to PlayMaker's software and servers.

107.   HCRM accessed PlayMaker's system with the intent to misappropriate its trade secrets and other confidential and proprietary information and to use that information to gain an unfair advantage against its competitor, PlayMaker.

***UPON INFORMATION AND BELIEF, HCRM USED ITS ACCESS TO PLAYMAKER'S SOFTWARE TO MISAPPROPRIATE PLAYMAKER'S TRADE SECRETS IN CONNECTION WITH THE DEVELOPMENT OF HCRM'S MOBILE APPLICATION***

108.   Upon information and belief, HCRM also used the information it acquired through its unauthorized access of PlayMaker's software and servers to reverse engineer highly confidential and proprietary software.

109.   On September 18, 2012, HCRM released a new version of its core software. HCRM's website touted this new version as follows:

> New features and enhancements span the entire product set of HomecareCRM including a new ad-hoc reporting module, Harvest enhancements (our popular, integrated prospecting data solution), and an improved Administrator, to name a few.
>
> "This is one of our biggest releases," says Keagen Brown, Vice President of Product Management. "HomecareCRM continues to build on the industry-leading CRM solution and we can thank our many customers for providing the valuable input and feedback."

110.   During its unauthorized access, HCRM reviewed all aspects of PlayMaker's software, including specifically reviewing the reporting aspects of Playmaker's CRM software on numerous occasions. Keagan Brown and Annie Tunnell McDaniel were key players in HCRM's effort to obtain improper knowledge regarding PlayMaker's CRM software. Upon information and belief, HCRM relied on its improper knowledge of PlayMaker CRM's software trade secrets to aid in the development of the new version of the HCRM's core CRM software.

111.   Among the individuals who reviewed PlayMaker's software using the LivinRite account were Joseph Caudill (HCRM's Vice President of Technical Services and the chief architect of HCRM's CRM software), Keagan Brown (HCRM's Vice President of Product Management), Annie Tunnell McDaniel (HCRM's Vice President of Support Services), and three business analysts.

112.   HCRM has admitted that Caudill reviewed PlayMaker's mobile application on October 1, 2012, together with Keagan Brown. However, the Jill Turner password was also used on October 2, 2012, by an HCRM employee accessing the system from Delaware, as well. On two separate days, HCRM reviewed PlayMaker's mobile application using multiple mobile devices, including an iPhone, an iPad, and a Samsung tablet. These devices run on the Apple iOS or Google Android mobile device operating systems.

113.   On October 15, 2012, HCRM announced that it would be releasing a new mobile application for its HomecareCRM software, called the "Native Mobile App for iOS and Android."

114.   Four days later, on October 19, 2012, HCRM made at least three unsuccessful attempts to access PlayMaker's system via the Jill Turner password using an iPhone, but the password had been deactivated based on Turner's departure from LivinRite on October 15, 2012.

115.   Upon information and belief, HCRM's new mobile application was released at the end of October, 2012. Upon information and belief, HCRM used its improper knowledge of PlayMaker CRM's Software Trade Secrets in order to improve and/or develop HCRM's "Native Mobile App for iOS and Android."

116. The trade secrets misappropriated by HCRM, Tunnell, Brown and McDaniel have enabled HCRM to enhance the functionality of its own software products, to avoid incurring the substantial costs and expenses associated with software development, and to obtain other competitive advantages which would not have been available to HCRM had it not engaged in misconduct.

117. This egregious conduct has caused and continues to cause irreparable injury to PlayMaker and violates federal and state statutes.

### HCRM KNEW THAT ACCESS TO PLAYMAKER'S SOFTWARE AND SYSTEMS WAS UNAUTHORIZED AND IMPROPER

118. LivinRite never authorized HCRM, Annie Tunnell McDaniel, Keagan Brown, or any other HCRM employee or agent to access PlayMaker's CRM software or LivinRite's data which is stored in PlayMaker's software on PlayMaker's servers, located in Delaware.

119. In fact, LivinRite's employees have been instructed to never share their password or otherwise allow anyone who is not a LivinRite employee or an authorized consultant to access PlayMaker's systems or software.

120. Kevin Smith was not authorized by LivinRite to share LivinRite's login credentials for the PlayMaker software and systems with any third party.

121. At the time McDaniel requested login credentials to PlayMaker's software, McDaniel and the HCRM Defendants knew or should have known that

she, an officer of PlayMaker's chief competitor, was not authorized to have login credentials to PlayMaker's CRM software or to access the program.

122.   At the time McDaniel requested login credentials to PlayMaker's system, McDaniel and the HCRM Defendants knew or should have known that LivinRite's use of its PlayMaker login and password was subject to the terms of use contained in an agreement between PlayMaker and LivinRite.

123.   On March 27, 2012 at 2:55 p.m., HCRM reviewed PlayMaker's terms of use, which make clear that the password is for a specific LivinRite user's exclusive use, that LivinRite may not make PlayMaker's software available to any third party, and that LivinRite will "use commercially reasonable efforts to prevent unauthorized access to, or use of" the PlayMaker software. Furthermore, the terms of use that HCRM reviewed state explicitly,

> "Customer shall not (i) modify, copy or create derivative works based on the Service; (ii) frame or mirror any content forming part of the Service, other than on Customer's own intranets or otherwise for its own internal business purposes; (iii) reverse engineer the Service; or (iv) access the Service in order to (A) build a competitive or functionally similar product or service, or (B) copy any ideas, features, functions or graphics of the Service."

124.   HCRM employees reviewed these terms of use on at least four additional occasions, including, at minimum: once more on March 27 from

Birmingham, Alabama; twice on March 28 from Newark, Delaware; and once on March 28 from Bear, Delaware.

125.   After reviewing the terms of use multiple times, HCRM knew without a doubt that use by HCRM of LivinRite's login and password was unauthorized by PlayMaker and in violation of the terms of use.

## OTHER WRONGFUL ACTS

126.   In addition to the trade secret theft and types of business practices alleged above, the HCRM Defendants brought the instant litigation as a last ditch, anti-competitive maneuver. Upon information and belief, the purpose of bringing the lawsuit was so that the HCRM Defendants could tell unsuspecting clients and potential clients that PlayMaker "was involved in a big lawsuit," in a continuing effort to impugn the reputation of PlayMaker and scare off potential customers. In fact, HCRM made a very similar statement in the email sent to one of PlayMaker's existing customers. (*See* **Exhibit A**).

127.   Upon information and belief, Tunnell has gone from company to company, making misrepresentations about his products and his competitors, using whatever tactics are necessary to close a sale. He is now using HCRM and

Contactivation to carry out these acts—acts which are resulting in significant harm to PlayMaker and other consumers and competitors in the home care industry.

128.   For example, the trade secret theft and unauthorized access to PlayMaker's systems via a potential client as described above, subjects third parties, such as LivinRite, to civil liability to PlayMaker and others, so that the HCRM Defendants can unfairly compete at the expense of others.

## COUNTERCLAIM ONE AGAINST HCRM AND TUNNELL: LIBEL

129.   PlayMaker realleges all allegations above and incorporates them herein by reference.

130.   Tunnell and HCRM have published defamatory statements in writing about PlayMaker regarding its software products, business and financial health.

131.   These defamatory statements were and are false.

132.   These defamatory statements have been published to third parties with knowledge of the falsity of the statements or reckless disregard as to the falsity of the statements.

133.   These defamatory statements have been published to PlayMaker's customers and/or potential customers maliciously with deliberate intent to damage PlayMaker's reputation and business.

134.   Tunnell published defamatory statements about PlayMaker while acting within the scope of his employment for HCRM.

135.   HCRM refused to rectify the statements made by Tunnell and instead ratified these statements.

136.   These defamatory statements have caused actual injury to PlayMaker's reputation and business, thus causing it substantial damage.

## COUNTERCLAIM TWO AGAINST HCRM AND TUNNELL: SLANDER

137.   PlayMaker realleges all allegations above and incorporates them herein by reference.

138.   Tunnell and HCRM have orally published defamatory statements about PlayMaker regarding its software products, business and financial health.

139.   These defamatory statements were and are false.

140.   These defamatory statements have been published to others with knowledge of the falsity of the statements or reckless disregard as to the falsity of the statements.

141.   These defamatory statements have been published to PlayMaker's customers and/or potential customers maliciously with deliberate intent to damage PlayMaker's reputation and business.

142.   Tunnell published defamatory statements about PlayMaker while acting within the scope of his employment for HCRM.

143.   HCRM refused to rectify the statements made by Tunnell and instead ratified these statements.

144.   These defamatory statements have caused actual injury to PlayMaker's reputation and business, thus causing it substantial damage.

## COUNTERCLAIM THREE AGAINST THE HCRM DEFENDANTS: FALSE ADVERTISING AND UNFAIR COMPETITION

145.   PlayMaker realleges all allegations above and incorporates them herein by reference.

146.   Upon information and belief, HCRM, Contactivation and Tunnell have made false misrepresentations of fact and/or false advertising claims to an appreciable number of consumers with the intent of influencing the buying decisions of these consumers.

147.   By way of a few examples, upon information and belief, HCRM, Contactivation and Tunnell have falsely represented and advertised to customers and potential customers that the HomecareCRM software is based on the latest version of SalesLogix when in fact it is not; that the software itself reflects that it contains the latest version of SalesLogix software when it fact it does not; that HCRM has an exclusive contract with AllScripts which forbids AllScripts from

integrating with any other CRM software when it does not; that AllScripts is contractually forbidden from integrating with PlayMaker, when in fact it is not; that PlayMaker is contractually forbidden from integrating with AllScripts when it is not; and that HCRM is permitted to integrate with HomeCareHomeBase's software products when it is not.

148.   These false advertisements and and/or misleading statements of fact, made in the course of the HCRM Defendants' sales presentations to customers and in promotional activities and correspondence with customers, misrepresent the characteristics and qualities of Counter-Defendants' and PlayMaker's goods, services and commercial activities, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

149.   These false advertisements and and/or misleading statements of fact are material to consumers' purchasing decisions.

150.   Additionally, HCRM, Tunnell, Brown and McDaniel conspired to and did misappropriate HMS data by copying it from an Amedisys computer without authorization. HCRM then gave this proprietary data away to HCRM's customers for free, enabling HCRM to unfairly compete against PlayMaker.

151. Furthermore, HCRM, Tunnell, Brown, and McDaniel, without permission or authority, knowingly and intentionally accessed PlayMaker's

software and servers and misappropriated PlayMaker's trade secrets and other proprietary and highly confidential information. These actions were intended to, and did, give HCRM an unfair competitive advantage over PlayMaker and have caused damage to PlayMaker.

152. These actions have caused irreparable harm and will continue to cause such harm unless enjoined by this Court. There is no adequate remedy at law for such harm.

153. PlayMaker is entitled to recover from the HCRM Defendants all damages it has suffered due to their false advertising and continued misrepresentations to customers and potential customers and the HCRM Defendants' profits derived from such unfair and wrongful conduct in an amount to be proved at trial. PlayMaker is also entitled to treble these damages, pursuant to 15 U.S.C. § 1117.

154. The actions of the HCRM Defendants evidence a long pattern of wrongful conduct that is willful and deliberate. This deliberate and willful conduct amounts to exceptional circumstances and entitles PlayMaker to an award of attorney fees pursuant to 15 U.S.C. § 1117.

## COUNTERCLAIM FOUR AGAINST HCRM, CONTACTIVATION AND TUNNELL: VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT

155. PlayMaker realleges all allegations above and incorporates them herein by reference.

156. Upon information and belief, HCRM, Contactivation and Tunnell made false representations about the qualities and origin of HCRM's software products to multiple customers and potential customers, including but not limited to the following:

(1) HCRM's software is based on the latest version of SalesLogix when in fact it is not;

(2) HCRM has an exclusive contract with AllScripts which prevents AllScripts from integrating with any other CRM software, when in fact it does not;

(3) HCRM's products will work successfully with mobile devices, such as Blackberry phones, when they will not work with all BlackBerry phones;

(4) HCRM is permitted to integrate with HomeCareHomeBase products when such is not permitted by HomeCareHomeBase.

157. HCRM and Tunnell disparaged PlayMaker and its software products to customers and potential customers by making several false representations, including but not limited to the following:

(1)   AllScripts is contractually forbidden from integrating with PlayMaker, when in fact it is not;

(2)   PlayMaker is contractually forbidden from integrating with AllScripts when it is not;

(3)   PlayMaker will only disclose to a client that it is forbidden from integrating with AllScripts after the client signs a contract with PlayMaker;

(4)   PlayMaker is going out of business;

(5)   PlayMaker's products have not been used successfully by any of the top 100 Hospice/Homecare providers in the United States;

(6)   Using PlayMaker's products will lead to "disastrous" results; and

(7)   PlayMaker will make untruthful claims to customers because it is desperate for money.

158.   The conduct of HCRM, Contactivation and Tunnell constitutes unfair and deceptive trade practices in violation of the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A § 10-1-370, *et seq*. Specifically, HCRM, Contactivation and Tunnell have (1) caused likelihood of misunderstanding as to the affiliation, connection, or association between HCRM's products and AllScripts, as well as SalesLogix; (2) represented that HCRM products have characteristics, benefits,

status, and qualities that they do not have; (3) represented that HCRM products are of a particular standard, quality, or grade that they are not; (4) disparaged PlayMaker's products by false or misleading representation of fact; and/or (5) advertised HCRM products with intent not to sell them as advertised.

159.   HCRM, Contactivation and Tunnell willfully and intentionally engaged in these unfair and deceptive trade practices.

160.   The actions of HCRM, Contactivation and Tunnell are causing irreparable harm to PlayMaker's reputation and business, and they will continue to do so unless permanently enjoined by the Court.

161.   PlayMaker is entitled to recover its costs and attorneys' fees incurred as a result of this action.

### COUNTERCLAIM FIVE AGAINST HCRM, CONTACTIVATION AND TUNNELL: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

162.   PlayMaker realleges all allegations above and incorporates them herein by reference.

163.   PlayMaker had a prospective business relationship with specific, identifiable third parties for the provision of customer relationship management software and related services.

164.   HCRM, Contactivation and Tunnell were aware that PlayMaker had a prospective business relationship with specific, identifiable third parties for the provision of customer relationship management software and related services.

165.   Upon information and belief, HCRM, Contactivation and Tunnell intended to cause the termination of any prospective business relationships with PlayMaker for the provision of customer relationship management software and related services.

166.   HCRM, Contactivation and Tunnell acted with an improper motive to destroy PlayMaker's reputation and business.

167.   Upon information and belief, the actions of HCRM, Contactivation and Tunnell caused prospective customers from entering into a business relationship with PlayMaker.

168.   PlayMaker's reputation and business has been damaged by the actions of HCRM, Contactivation and Tunnell.

169.   PlayMaker is entitled to recover its costs and attorneys' fees incurred as a result of this action.

## COUNTERCLAIM SIX AGAINST THE HCRM DEFENDANTS: COMMON LAW UNFAIR COMPETITION

170.   PlayMaker realleges all allegations above and incorporates them herein by reference.

171.   Upon information and belief, HCRM and Contactivation used unfair means to develop their software products by using an outdated version of SalesLogix without paying the market-rate royalties to SalesLogix that would otherwise be due on software based on a current, up-to-date version of SalesLogix.

172.   Upon information and belief, the HCRM, Contactivation and Tunnell have made misleading statements to customers and potential customers regarding the affiliation between HCRM and AllScripts, as well as SalesLogix.

173.   Upon information and belief, HCRM, Tunnell, Brown and McDaniel wrongfully obtained copyrighted data belonging to HMS from a third party. Because HCRM did not pay for the wrongfully obtained data, it was able to give it away for free to its customers in an effort to influence those customer's buying decisions.

174.   Based on this unfair activity, the HCRM is able to undercut market prices and unfairly compete against PlayMaker because PlayMaker obtains its HMS data lawfully and must charge its customers the market rate for the data and software.

175.   Additionally, HCRM, Tunnel, Brown and McDaniel, without permission or authority, knowingly and intentionally accessed PlayMaker's software and servers and misappropriated PlayMaker's trade secrets and other

proprietary and highly confidential information.  These actions were intended to, and did, give HCRM an unfair competitive advantage over PlayMaker and have caused extensive damage to PlayMaker.

176.   The HCRM Defendants' conduct amounts to unfair competition that is likely to mislead and confuse customers and has caused damage to PlayMaker.

### COUNTERCLAIM SEVEN AGAINST HCRM: DECLARATORY JUDGMENT OF NON-INFRINGEMENT

177.   PlayMaker realleges all allegations above and incorporates them herein by reference.

178.   HCRM has alleged that it possesses trademark rights in the words "home care," "homecare" and "CRM" for the sale of CRM software in the home care industry.

179.   HCRM has alleged that it is wrongful and infringing for PlayMaker to use the words "home care," "homecare" and "CRM" as the common name for the parties' industry and the type of software that they both sell.

180.   PlayMaker asserts that these words are generic or, at most descriptive, and that it is entitled to use them to describe the products that it sells in the home care industry.

181.   There is a dispute between the parties on this point of such immediacy that this Court should determine the rights of the parties with respect to the use of these words in the home care industry.

182.   An actual case or controversy exists between these parties as to whether HCRM has any trademark rights in the indicated words.

183.   A judicial declaration is necessary and appropriate so that the parties may ascertain their respective rights regarding the use of these words.

184.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., PlayMaker is entitled to a judgment finding that HCRM has no trademark rights in the words "homecare," "home care" or "CRM" for the sale of CRM software in the home care industry.

### COUNTERCLAIM EIGHT AGAINST HCRM, TUNNELL, BROWN AND MCDANIEL: VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT

185.   PlayMaker realleges all allegations above and incorporates them herein by reference.

186.   On or about March 27, 2012, March 28, 2012, May 1, 2012, October 1, 2012 and October 2, 2012, HCRM, Brown and/or McDaniel accessed PlayMaker's software and servers.

187. HCRM, Brown and McDaniel were not authorized to access PlayMaker's software and servers.

188. HCRM, Brown and McDaniel knew they were not authorized to access PlayMaker's software or servers.

189. PlayMaker's servers and computer system are "protected" computers under 18 U.S.C. § 11030(e)(2).

190. Through their unauthorized access to PlayMaker's software and servers, HCRM, Brown and McDaniel obtained information from PlayMaker in violation of 18 U.S.C. § 1030(a)(2)(C).

191. HCRM's unauthorized conduct caused damage and/or loss to PlayMaker in an amount to be determined at trial.

## COUNTERCLAIM NINE AGAINST HCRM, TUNNELL, BROWN AND MCDANIEL: VIOLATION OF THE STORED COMMUNICATIONS ACT

192. PlayMaker realleges all allegations above and incorporates them herein by reference.

193. HCRM, Brown and McDaniel, and persons acting on HCRM's behalf, intentionally and without authorization, accessed PlayMaker's software and servers through which an electronic communications service is provided.

194.   Upon information and belief, this unauthorized access was done in concert with and/or at the direction of Tunnell.

195.   This access was not authorized.

196.   As a result of this improper access, upon information and belief, HCRM, Brown, McDaniel and Tunnell obtained an electronic communication while it was in electronic storage in PlayMaker's system and this unauthorized access caused actual harm to PlayMaker.

197.   The actions of HCRM, Brown, McDaniel and Tunnell violated 18 U.S.C.A. § 2701 and 18 U.S.C.A. § Section 2701 of the Stored Communications Act and as a result, have caused PlayMaker damages in an amount to be determined at trial.

### COUNTERCLAIM TEN AGAINST HCRM, TUNNELL, BROWN AND MCDANIEL:VIOLATION OF THE  ELECTRONIC COMMUNICATIONS PRIVACY ACT

198.   PlayMaker realleges all allegations above and incorporates them herein by reference.

199.   Upon information and belief, by accessing PlayMaker's software and servers, HCRM, Tunnell, Brown and McDaniel intentionally intercepted or endeavored to intercept electronic communications between LivinRite's employees

and/or between LivinRite's employees and PlayMaker occurring on PlayMaker's system.

200.   Upon information and belief, this unauthorized access was done in concert with and/or at the direction of Tunnell.

201.   The conduct of HCRM, Tunnell, Brown, and McDaniel violated 18 U.S.C. § 2511 of the Electronic Communications Privacy Act entitling PlayMaker to relief under 18 U.S.C. § 2520(a) of that Act and as a result, PlayMaker has been damaged and is entitled to damages in an amount to be determined at trial.

## COUNTERCLAIM TWELVE AGAINST HCRM, TUNNELL, BROWN AND MCDANIEL: VIOLATIONS OF GEORGIA TRADE SECRETS ACT

202.   PlayMaker realleges all allegations above and incorporates them herein by reference.

203.   The information accessed by HCRM, Brown and McDaniel on PlayMaker's servers contained PlayMaker's highly confidential and proprietary information, including trade secrets.

204.   On multiple occasions, HCRM, Brown, and McDaniel accessed, observed and copied PlayMaker's trade secrets, intellectual property, and other highly confidential and proprietary information.

205.   Upon information and belief, this unauthorized access was done in concert with and/or at the direction of Tunnell.

206.   These trade secrets and other information are not generally known by or readily ascertainable by PlayMaker's competitors.

207.   The accessed information provided HCRM, Tunnell, Brown and McDaniel with an economic advantage over PlayMaker because it contains proprietary information which is otherwise only available to PlayMaker's paying subscribers, which is subject to required non-disclosure and confidentiality agreements. The accessed trade secrets and other highly confidential and proprietary information are extremely valuable to PlayMaker as well as HCRM because of the competitive advantage they confer.

208.   PlayMaker takes great effort to protect its trade secrets by limiting access to those trade secrets to individuals and entities that possess a PlayMaker-issued login and password and have agreed to confidentiality and non-disclosure obligations.

209.   The actions of HCRM, Tunnell, Brown and McDaniel have been to the detriment of PlayMaker, and PlayMaker has suffered extensive damages caused by the unauthorized theft of its trade secrets, in an amount to be determined at trial.

## COUNTERCLAIM THIRTEEN AGAINST HCRM, TUNNELL, BROWN AND MCDANIEL: VIOLATION OF TENNESSEE PERSONAL AND COMMERCIAL COMPUTER ACT

210.   PlayMaker realleges all allegations above and incorporates them herein by reference.

211.   HCRM, Tunnell, Brown and McDaniel intentionally, without permission or authorization, accessed PlayMaker's computer system and network on multiple occasions, causing unauthorized copies to be made of PlayMaker's proprietary software and data.

212.   Upon information and belief, this unauthorized access was done in concert with and/or at the direction of Tunnell.

213.   Upon discovery of this unauthorized breach of its computer system and network, PlayMaker immediately initiated an extensive investigation to determine the extent of proprietary data and information potentially accessed, received, and/or copied.

214.   The actions of HCRM, Tunnell, Brown and McDaniel violated Tenn. Code Ann. § 39-14-602, caused damage to PlayMaker in an amount to be determined at trial, and give rise to a claim for damages sustained in an amount to be determined at trial, as well as the costs of this action pursuant to Tenn. Code Ann. § 39-14-604.

## COUNTERCLAIM FOURTEEN AGAINST HCRM, TUNNELL, BROWN, AND MCDANIEL: BREACH OF TENNESSEE UNIFORM TRADE SECRETS ACT

215.   PlayMaker realleges all allegations above and incorporates them herein by reference.

216.   The information accessed by HCRM on PlayMaker's servers on multiple occasions contained PlayMaker's highly confidential and propriety information including trade secrets.

217.   On multiple occasions, HCRM accessed and observed—and in some cases copied—PlayMaker's trade secrets and other highly confidential and proprietary information.

218.   Upon information and belief, this unauthorized access was done in concert with and/or at the direction of Tunnell.

219.   The trade secrets and other information accessed during these incidents are not generally known by or readily ascertainable by competitors.

220.   The accessed trade secrets and information gave HCRM an economic advantage over PlayMaker because it contains proprietary information which is otherwise only available to PlayMaker's paying subscribers who only receive access to it subject to non-disclosure and confidentiality obligations.

221.   The accessed trade secrets and other confidential and proprietary information are extremely valuable to PlayMaker as well as HCRM because of the competitive advantage they confer.

222.   PlayMaker takes great effort to protect its trade secrets by limiting access to those trade secrets to individuals and entities that possess a PlayMaker-issued login and password and have agreed to confidentiality and non-disclosure obligations.

223.   The actions of HCRM, Tunnell, Brown and McDaniel have been to the detriment of PlayMaker and PlayMaker has suffered extensive damages caused by the unauthorized theft of PlayMaker's trade secrets, in an amount to be determined at trial.

### COUNTERCLAIM FIFTEEN AGAINST HCRM, CONTACTIVATION AND TUNNELL: VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT

224.   PlayMaker realleges all allegations above and incorporates them herein by reference.

225.   Upon information and belief, HCRM, Contactivation and Tunnell made false representations about the qualities and origin of the HomecareCRM software product to multiple customers and potential customers including, but not limited to, the following:

(1)   HomecareCRM is based on the latest version of SalesLogix when in fact it is not;

(2)   HCRM has an exclusive contract with AllScripts which prevents AllScripts from integrating with any other CRM software when in fact it does not;

(3)   The HomecareCRM software will work successfully with mobile devices, such as Blackberry phones, when they have not worked with all Blackberry phones;

(4)   The HomecareCRM software is permitted to integrate with HomeCareHomeBase products when such is not permitted by HomeCareHomeBase.

226.   The HCRM, Contactivation and Tunnell disparaged PlayMaker and its software products to customers and potential customers by making several false representations, including but not limited to the following:

(1)   AllScripts is contractually forbidden from integrating with PlayMaker, when in fact it is not;

(2)   PlayMaker is contractually forbidden from integrating with AllScripts when it is not;

(3)   PlayMaker will only disclose to a client that it is forbidden from integrating with AllScripts after the client signs a contract with PlayMaker;

(4)   PlayMaker is going out of business;

(5)   PlayMaker's products have not been used successfully by any of the top 100 Hospice/Homecare providers in the United States;

(6)   Using PlayMaker's products will lead to "disastrous" results; and

(7)   PlayMaker will make untruthful claims to customers because it is desperate for money.

227.   The conduct of HCRM, Contactivation and Tunnell constitutes unfair and deceptive trade practices in violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101, *et seq*. Specifically, HCRM, Contactivation and Tunnell have (1) caused likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of the HomecareCRM software products by AllScripts, as well as SalesLogix; (2) caused likelihood of confusion or misunderstanding as to affiliation, connection or association between the HomecareCRM software and AllScripts, as well as between the HomecareCRM software and SalesLogix; (3) disparaged PlayMaker's products, services, and business reputation the by false or misleading representations of fact; (4) advertised the HomecareCRM software with intent not to sell them as advertised; and (5) made statements that create a false impression of the quality of the HomecareCRM software in a manner that, upon disclosure of the true facts, there is a likelihood that HCRM and/or Contactivation customers would switch from HCRM products to other software products.

228.   HCRM, Contactivation and Tunnell willfully and knowingly engaged in these unfair and deceptive trade practices.

229.   The actions of HCRM, Contactivation and Tunnell have caused irreparable harm to PlayMaker's reputation and business, and they will continue to do so unless permanently enjoined by the Court.

230.   PlayMaker is entitled to recover three times its actual damages, in addition to its costs and attorneys' fees incurred as a result of this action.

## COUNTERCLAIM SIXTEEN AGAINST HCRM, TUNNELL, BROWN AND MCDANIEL: VIOLATION OF TENNESSEE WIRETAP ACT

231.   PlayMaker realleges all allegations above and incorporates them herein by reference.

232.   Upon information and belief, HCRM, Tunnell, Brown and McDaniel intentionally intercepted, disclosed, and used LivinRite employees' and/or LivinRite employees' and PlayMaker's electronic communications.

233.   These actions violated Tenn. Code Ann. § 39-13-601, et seq., caused damage to PlayMaker, and gives rise to a claim under Tenn. Code Ann. § 39-13-603 for damages in an amount to be determined at trial.

## COUNTERCLAIM SEVENTEEN AGAINST HCRM, TUNNELL, BROWN AND MCDANIEL: VIOLATION OF ALABAMA TRADE SECRETS ACT

234.   PlayMaker realleges all allegations above and incorporates them herein by reference.

235.   PlayMaker's software and servers contain trade secrets.

236.   HCRM, Tunnell, Brown and McDaniel misappropriated those trade secrets.

237.   This unauthorized discovery of PlayMaker's trade secrets was done through improper means.

238.   HCRM, Tunnell, Brown and McDaniel knew or should have known that the manner in which they misappropriated PlayMaker's trade secrets was improper.

239.   HCRM's actions violate the Alabama Uniform Trade Secrets Act, Ala. Code. Secs. 8—27-1 *et seq.*

240.   As a result of this misappropriation of PlayMaker's trade secrets, PlayMaker has suffered damages in an amount to be determined at trial.

## COUNTERCLAIM EIGHTEEN AGAINST THE HCRM DEFENDANTS: VIOLATION OF THE ALABAMA TRADE PRACTICES ACT

241.   PlayMaker realleges all allegations above and incorporates them herein by reference.

242.   Upon information and belief, HCRM, Contactivation and Tunnell made false representations about the qualities and origin of the HomecareCRM

software to multiple customers and potential customers, including but not limited to the following:

(1)   The HomecareCRM software is based on the latest version of SalesLogix when in fact it is not;

(2)   HCRM has an exclusive contract with AllScripts which prevents AllScripts from integrating with any other CRM software, when in fact it does not;

(3)   The HomecareCRM software will work successfully with mobile devices, such as Blackberry phones, when they have not worked with all BlackBerry phones; and

(4)   The HomecareCRM software is permitted to integrate with HomeCareHomeBase products when such is not permitted by HomeCareHomeBase.

243.   HCRM, Contactivation and Tunnell disparaged PlayMaker and its products to customers and potential customers by making several false representations, including but not limited to the following:

(1)   AllScripts is contractually forbidden from integrating with PlayMaker, when in fact it is not;

(2) PlayMaker is contractually forbidden from integrating with AllScripts when it is not;

(3) PlayMaker will only disclose to a client that it is forbidden from integrating with AllScripts after the client signs a contract with PlayMaker;

(4) PlayMaker is going out of business;

(5) Playmaker's products have not been used successfully by any of the top 100 Hospice/Homecare providers in the United States;

(6) Using PlayMaker's products will lead to "disastrous" results; and

(7) PlayMaker will make untruthful claims to customers because it is desperate for money.

244.  On multiple occasions, HCRM, Brown and McDaniel gained unauthorized access to PlayMaker's servers, intentionally intercepted or endeavored to intercept PlayMaker's electronic communications with LivinRite and misappropriated PlayMaker's trade secrets.

245.  Upon information and belief, this unauthorized access was done in concert with and/or at the direction of Tunnell.

246.  The HCRM Defendants' conduct constitutes unfair and deceptive trade practices in violation of the Alabama Deceptive Trade Practices Act, Alabama Code § 8-19-1, *et seq*. Specifically, the HCRM Defendants have (1) caused likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of the HomecareCRM software by AllScripts, as well as SalesLogix; (2) caused likelihood of confusion or misunderstanding as to affiliation, connection or association between the HomecareCRM software and

67

AllScripts, as well as SalesLogix; (3) disparaged PlayMaker's products, services and business reputation the by false or misleading representations of fact; (4) advertised the HomecareCRM software with intent not to sell them as advertised; (5) represented that the HomecareCRM software has sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that it does not have; (6) misrepresented the standard, quality or grade the HomecareCRM software; and/or (7) engaged in other unconscionable, false, misleading or deceptive acts by gaining unauthorized access to PlayMaker's servers, intercepting PlayMaker's electronic communications with LivinRite and misappropriating PlayMaker's trade secrets.

247.   The HCRM Defendants willfully engaged in these unfair and deceptive trade practices.

248.   The HCRM Defendants' actions are causing irreparable harm to PlayMaker's reputation and business, and they will continue to do so unless permanently enjoined by the Court.

249.   PlayMaker is entitled to recover three times its actual damages, in addition to its costs and attorneys' fees incurred as a result of this action.

## COUNTERCLAIM NINETEEN AGAINST HCRM, TUNNELL, BROWN AND MCDANIEL: VIOLATION OF DELAWARE TRADE SECRETS ACT

250.   PlayMaker realleges all allegations above and incorporates them herein by reference.

251.   PlayMaker's software and servers contain trade secrets.

252.   HCRM, Tunnell, Brown and McDaniel misappropriated those trade secrets.

253.   This unauthorized discovery of PlayMaker's trade secrets was done through improper means.

254.   HCRM, Tunnell, Brown and McDaniel knew or should have known that the manner in which they misappropriated PlayMaker's trade secrets was improper.

255.   The actions of HCRM, Tunnell, Brown and McDaniel violate the Delaware Uniform Trade Secrets Act, Del. Code Ann. Title 6 Secs. 2001 *et seq*.

256.   This misappropriation of PlayMaker's trade secrets has damaged PlayMaker in an amount to be determined at trial.

### COUNTERCLAIM TWENTY AGAINST HCRM, TUNNELL BROWN, AND MCDANIEL: VIOLATION OF VIRGINIA TRADE SECRETS ACT

257.   PlayMaker realleges all allegations above and incorporates them herein by reference.

258.   PlayMaker's software and servers contain trade secrets.

259.   HCRM, Tunnell, Brown and McDaniel misappropriated those trade secrets.

260.   The unauthorized discovery of PlayMaker's trade secrets was done through improper means

261.   HCRM, Tunnell, Brown and McDaniel knew or should have known that the manner in which they misappropriated PlayMaker's trade secrets was improper.

262.   The actions of HCRM, Tunnell, Brown and McDaniel violate the Virginia Uniform Trade Secrets Act, Va. Code. Ann. Secs. 59-1-336, *et seq.*

263.   The misappropriation of PlayMaker's trade secrets damaged PlayMaker in an amount to be determined at trial.

## COUNTERCLAIM TWENTY-ONE AGAINST THE HCRM DEFENDANTS:  INJUNCTIVE RELIEF

264.   PlayMaker realleges all allegations above and incorporates them herein by reference.

265.   The actions of the HCRM Defendants have caused and are causing irreparable harm to PlayMaker's reputation and business. PlayMaker has spent much time and effort developing its products and business and has enjoyed substantial success in the marketplace. If the HCRM Defendants are permitted to continue their false and misleading communications and utilizing the trade secrets they have misappropriated, PlayMaker will lose this momentum because of harm

to its reputation and loss of the competitive advantage conferred by its trade secrets.

266. PlayMaker is entitled to injunctive relief restraining the HCRM Defendants as proven at trial.

## COUNTERCLAIM TWENTY-TWO AGAINST THE HCRM DEFENDANTS: ATTORNEY'S FEES

267. PlayMaker realleges all allegations above and incorporates them herein by reference.

268. The HCRM Defendants' willful deceptive acts and practices and intentionally tortious conduct demonstrate the HCRM Defendants have acted in bad faith.

269. As a result of the HCRM Defendants' bad faith, PlayMaker has incurred expenses of litigation including costs and attorney fees which PlayMaker is entitled to recover from some or all of the HCRM Defendants pursuant to O.C.G.A. § 13-6-11 and the laws of Alabama, Delaware, Tennessee and Virginia.

270. PlayMaker is further entitled to reimbursement of its costs pursuant to O.C.G.A. § 10-1-373(b)(2), as well as pursuant to the laws of Alabama, Delaware, Tennessee and Virginia.

271. PlayMaker is entitled to recover its attorney's fees because the HCRM Defendants have been and are engaging in willful deceptive acts or

practices, knowing said acts or practices to be deceptive, against PlayMaker in the conduct of their business, such acts or practices including, but not limited to, making false or misleading statements in commercial advertising or promotion which misrepresent the nature, characteristics and/or qualities of goods and services associated with PlayMaker, as well as misrepresenting the nature, characteristics, and/or qualities of the goods and services that the HCRM Defendants are capable of tendering and/or performing.

## COUNTERCLAIM TWENTY-THREE AGAINST THE HCRM DEFENDANTS: PUNITIVE DAMAGES

272.   PlayMaker realleges all allegations above and incorporates them herein by reference.

273.   The HCRM Defendants' conduct amounts to willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care raising the presumption of conscious indifference to consequences in that the HCRM Defendants  intentionally and willfully have engaged in deceptive acts or practices against PlayMaker in the conduct of its business, such acts or practices including, but not limited to, making false or misleading statements in commercial advertising or promotion and engaging in other tortious conduct including violation of the Georgia's Uniform Deceptive Trade Practices Act, unfair competition, and tortious interference with business relations.

274.   Pursuant to O.C.G.A. § 10-1-373(c), and the laws of Alabama, Delaware, Tennessee and Virginia, PlayMaker is entitled to punitive damages because some or all of the HCRM Defendants have been and are engaging in willful deceptive acts or practices against PlayMaker in the conduct of its business, such acts or practices including, but not limited to, making false or misleading statements in commercial advertising or promotion, which misrepresent the nature, characteristics and/or qualities of goods and services associated with PlayMaker, as well as misrepresenting the nature, characteristics, and/or qualities of the goods and services that the HCRM Defendants' are capable of tendering and/or performing.

275.   Pursuant to O.C.G.A. § 51-12-5.1, and the laws of Alabama, Delaware, Tennessee and Virginia, PlayMaker is entitled to punitive damages to deter and punish the HCRM Defendants from such other and further conduct calculated with a specific intent to cause harm to PlayMaker.

## **PRAYER FOR RELIEF**

In view of the foregoing, Defendant seeks the following relief. This is PlayMaker's first application for extraordinary relief.

1.   That Plaintiff's Complaint be dismissed with prejudice and costs taxed to Plaintiff;

2.     That a jury be empaneled to hear this cause;

3.     That judgment be awarded to PlayMaker on all counts of its Counterclaim, as amended;

4.     That PlayMaker be awarded a permanent injunction as proven at trial;

5.     That HCRM Defendants be required to make appropriate remedial measures as determined after a hearing on these issues to correct the false and defamatory statements that some or all of them have made regarding their own products and PlayMaker and its products;

6.     That PlayMaker be awarded a judgment that the words "homecare," "home care," and/or "CRM" are generic for the sale of CRM software in the home care industry and that it is free to use these words to describe its products;

7.     That PlayMaker be awarded compensatory damages, an award of HCRM Defendants' profits and its reasonable attorneys' fees arising from HCRM Defendants' false advertising;

8.     That PlayMaker be awarded compensatory and punitive damages and attorney fees for unfair trade practices under the state law of Georgia;

9.     That PlayMaker be awarded compensatory damages for common law unfair competition;

10.     That PlayMaker be awarded all damages to which it is entitled for theft of its trade secrets under various federal and state laws, as alleged herein;

11.     That PlayMaker be awarded all damages to which it is entitled for HCRM's violations of the Computer Fraud and Abuse Act;

12.     That PlayMaker be awarded all damages to which it is entitled for HCRM's violations of the Stored Communications Act;

13.     That PlayMaker be awarded all damages to which it is entitled for HCRM's violations of the Electronic Communications Privacy Act;

14.     That PlayMaker be awarded all damages to which it is entitled for HCRM's violations of the Tennessee Wiretap Act;

15.     That PlayMaker be awarded all damages to which it is entitled for HCRM's violations of the Tennessee Personal and Commercial Computer Act;

16.     That PlayMaker be awarded compensatory and punitive damages arising from the tortious conduct of the HCRM Defendants in an amount to be proved at trial; and

17.     Any other relief to which this Court determines that PlayMaker is entitled after a full trial on the merits.

Respectfully submitted,

*/s/ Ann G. Fort*

Ann G. Fort, Esq. (GA Bar 269995)
John H. Fleming, Esq. (GA Bar 2632250)
SUTHERLAND ASBILL & BRENNAN LLP
999 Peachtree Street, NE
Atlanta, Georgia 30309-3996
Telephone: (404) 853-8000
Facsimile: (404) 853-8806
Email:          ann.fort@sutherland.com
                john.fleming@sutherland.com

Paige Waldrop Mills, Esq.
Joshua R. Denton, Esq.
Bass, Berry & Sims PLC
150 Third Avenue South
Suite 2800
Nashville, TN 37201
Telephone: (615) 742-6200
Facsimile: (615) 742-6293
Email:          pmills@bassberry.com
                jdenton@bassberry.com

*Attorneys for Defendant The Adam Group, Inc.,
d/b/a PlayMaker CRM*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 14th day of January, 2013, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to the following parties as indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

Mark S. VanderBroek
Christopher Wiech
Puja R. Patel
TROUTMAN SANDERS LLP
5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia 30308

*/s/ Ann G. Fort*